IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

JOHN HAYNES,

     Plaintiff,

VERSUS                                             CIVIL ACTION NO.: 3:06CV254-W-A

CITY OF DURANT, MISSISSIPPI,
HOWARD ROBERTS, JIM FERGUSON,
ISAIAH WINDERS, DORA
PARKERSON and JOHNNY
PRITCHARD, in their
individual capacities,

     Defendants.

---

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

COMES NOW, the Plaintiff, John Haynes, by and through counsel, and files this his

Brief in Opposition to Defendants' Motion for Summary Judgment [Docket 59], and would

show unto the Court the following:

### FACTS

The Plaintiff, John Haynes, is a black male.  Deposition of John Haynes, p. 48, Exhibit

"A."  He was originally hired by the City of Durant as a dispatcher in 1994.  Haynes depo., p.

11.  He moved to the police department in 1996 and became a police officer.  Haynes depo., pp.

11-12.  Haynes eventually worked his way up to being the assistant police chief with the City of

Durant.  Haynes depo., p. 27.  Jerry Bankhead is the chief of police.  Haynes depo., p. 35;

Deposition of 30(b)(6) Representative, Johnny Prichard, pp. 6-7, Exhibit "B."

Everyone agrees that John Haynes was a good officer.  Deposition of Isaiah Winters, pp. 16-17, 19, Exhibit "C"; Deposition of Dora Parkinson, p. 14, Exhibit "D"; Deposition of Jim Ferguson, p. 14, Exhibit "E"; Deposition of Howard Roberts, pp. 14-15, Exhibit "F."

Haynes got himself into some hot water in November 2004.  People were in the habit of hanging out in the Fred's store parking lot to watch high school football games which were held just next door.  Fred's store management called the police department and wanted the parking lot cleared.  Haynes' depo., pp. 35-36.  Steve Allen and Haynes responded.  Haynes' depo., p. 36.  The chief later claimed to have radioed that Fred's employees should not be removed from the parking lot, Haynes' depo., pp. 45, 108-09, although Haynes never hear that.  *Id.*

Alderman Jim Ferguson was watching the football game from the Fred's parking lot.  He was an employee of Fred's, and refused to leave.  Haynes' depo., p. 36.  Haynes never heard the chief say to not chase off Fred's employees.  Haynes' depo., pp. 108-09.  Haynes asked Ferguson to leave, and Ferguson refused so Haynes arrested Ferguson for disorderly conduct, failure to comply with the lawful orders of a police officer.  Haynes' depo., pp. 38-40.   The chief suspended Haynes for two days for arresting Alderman Ferguson.  Haynes' depo., p. 46.  The chief notified the board that Haynes had been suspended.  Board Minutes of November 18, 2004, Exhibit "G."  Haynes appealed the suspension and it was later revoked with Haynes receiving his two days' pay.  Haynes' depo., pp. 47-49; Board Minutes of March 1, 2005, Exhibit "H."

In 2005, the board consisted of Aldermen Mary Johnson, who is African-American,

Johnny Bankhead, also African-American, Jim Ferguson, who is Caucasian, Howard Roberts, who is also Caucasian, and Isaiah Winters, who is African-American. Winters' depo., pp. 3-4; Haynes' depo., pp. 54, 75-76. Mayor Eddie Logan was convicted of a felony and removed from office. Haynes' depo., pp. 48, 60; 30(b)(6) depo., p. 5. After Logan was removed from office, Alderman Howard Roberts, the vice-mayor, stepped in as acting mayor for about three months until the new election was scheduled. 30(b)(6) depo., p. 5; Winters' depo., p. 4; Roberts' depo., pp. 3, 12.

On March 2, 2005, Haynes was quoted extensively in a newspaper article in the local Star-Herald. Haynes depo., pp. 50-51, and Exhibit 7 thereto; 30(b)(6) depo., p. 9. Haynes said that some of the aldermen who testified against ex-mayor Eddie Logan had "used their influence to help themselves and their friends get out of trouble with the law..." Haynes was quoted as saying "we've got to get away from the buddy system ... it's ruining our city, our whole county." Haynes said that the integrity of the Durant Police Department was called into question when the aldermen who saw Logan embezzling money from the City did not call the Durant Police Department to handle the case.

The article also states "Haynes said he wrote a ticket to Alderman Isaiah Winters for not wearing a seatbelt, but it was dismissed by Municipal Judge Jim Arnold. 'He gave the same excuse six other people before him gave, but he's the only one that got out of [a ticket]' Haynes said." The article also discussed the previous situation where Alderman Jim Ferguson was arrested. The article stated:

> During football season, he charged Alderman Jim Ferguson with disorderly conduct. Haynes said he told Ferguson, who was watching a Durant High game

3

from the Fred's parking lot, he had to pay and go into the stadium. Ferguson refused, Haynes said.
"That's what I was told to do," Haynes said.
Haynes wound up getting suspended for two days without pay, he said, and just recently got his money back after winning an appeal.
"Everybody knew what was going to happen," Haynes said. "It was all over town." "He arrested an alderman but [the alderman's] going to get out of it.

Exhibit 7 to Haynes' depo.

The article also quotes Haynes as saying that two married aldermen were sleeping with City employees. "'It's going on and everybody knows it,' he said. 'Two of them were just caught in a motel in Kosciusko just two weeks ago.'" Exhibit 7 to Haynes' depo.

The article went on to state that:

"Haynes acknowledged that the aldermen's offenses weren't felonies, like the one Logan was convicted of and the other four City officials were charged with. But it's still abusing power and it's holding back the town," he said.
"We need a community-oriented government to go get business in here," he said. "We need people in the board meetings, and not just when there's a controversy. We still have attributes that make us one of the best small cities around. We've got the traffic flow, the empowerment zone ..."

Exhibit 7 to Haynes' depo; Haynes' depo., pp. 50-54.

These statements had nothing to do with police business. They were about a corrupt judge and politics, the meat of First Amendment speech. Haynes was incorrectly quoted as saying that he wrote the ticket to Isaiah Winters. Officer Robert Land actually wrote the ticket to Winters. Haynes' depo., pp. 55, 69-70; Winters' depo., p. 11. Additionally, Haynes did not say that two married aldermen were sleeping with City employees. Haynes' depo., pp. 56, 68-69. The reporter specifically asked about Alderman Howard Roberts and a City employee named Michelle. Haynes just told the reporter that "if it is going on, you know, then they shouldn't be."

4

Haynes' depo., pp. 56-57.  Haynes did not care if Roberts and Michelle were sleeping together or not.  The problem was that they were caught in a motel on City time.  Haynes' depo., pp. 59, 62-63.  If that, in fact, had happened, then it was a lack of integrity.  Haynes' depo., p. 60. Haynes called the reporter two times to try to have the corrections printed, but was never able to reach him.  Haynes' depo., p. 69.

The Board of Aldermen meeting minutes for March 15, 2005 state:

Motion by Alderman Bankhead seconded by Alderman Winters to have Assistant Police Chief John Haynes resign his position with two weeks severance pay, nothing negative beyond his employment record from the Durant Police Department, or for him to come before the Board with proof of his accusations he had published in the Star-Herald newspaper.  If John can provide no proof, then he will possibly face disciplinary action.  One vote called.  All ayes.

Board Minutes of March 15, 2005, Exhibit "I"; Winters' depo., pp. 15-16, 18; see also, Haynes' depo., pp. 65-66.

Board attorney John Gilmore then wrote Haynes a letter.  In the letter, Gilmore stated that "the mayor and board have received a good deal of complaints regarding your activities while acting a Durant police officer and also the statements made to local newspapers." Plaintiff's Pre-Discovery Disclosure of Core Information, Document Nos. 12 and 15, Exhibit "J."  He stated that he was authorized to offer Haynes two-weeks severance pay in return for his voluntary resignation.  He further stated that if Haynes did not resign, the mayor and board would "begin discussions and hearings on your status change as an employee of the City of Durant, Mississippi pursuant to the personnel policy for the City of Durant."  The letter identified several sections of the disciplinary portion of the City's handbook, including "incompetency in the performance of assigned duties," "refusal to follow the orders of a

supervisor," "misconduct while on duty," "falsification of any required information," "participating in any political activity other than expressing an opinion in private and by voting," "unauthorized statements to local newspapers in your capacity as an employee," "slanderous statement about fellow employees" and "slanderous and public accusations of illegal activities by the City judge." Exhibit 13 to Winters' depo.

Haynes declined to resign, and went to the next board meeting. In the board meeting, he was told that "you shot yourself in the foot." Winters' depo., pp. 23-24. Haynes came prepared with evidence. He had proof, including court dockets. The board did not ask Haynes to give them the evidence. He was asked about his statements related to affairs between aldermen and City employees, and Haynes told them that they needed to ask the people involved. "And, you know, if you don't' do that, then you're not really looking for the truth." Haynes' depo., p. 67. That board insisted that Haynes retract his statements, saying that none of them were true. Haynes' depo., pp. 67-68. Haynes declined. In the meeting, Winters asked Haynes if he was going to retract the statement. When Haynes said "no," Winters said, "well, you know, you're going to get fired." Haynes' depo., p. 116.

> That's – they wanted me to say that it wasn't true, and I said, no. Because I'm not going to put myself in that position to say something that wasn't true.
> I said, "the only thing that's in that article that may have needed to be changed was about the employees sleeping with whoever," and I said "and I can call them and, you know, ask him about that if that will please ya'll."
> And they said, "no. We need the whole article done."

Haynes' depo., p. 68.

They did not ask Haynes to retract part of the article. They wanted him to retract the whole thing. Haynes' depo., p. 117.

Haynes did not act inappropriately in the board meeting. "I don't think I ever got upset. We may have raised our voices at each other, but I don't think I got upset." Haynes' depo., p. 71. Haynes did not refuse to answer questions, and contrary to the Defendant's version, he did not "storm" out of the meeting. Haynes' depo., p. 72. He was never insubordinate. What he did say in the meeting was that "ya'll ought to thank me for what I have done instead of – instead of reprimanding me, something of that nature." Winters' depo., p. 18.

On April 12, 2005, the board of aldermen voted to terminate Haynes. Board Minutes of April 12, 2005, Exhibit "K"; Haynes' depo., pp. 73-74. Jim Ferguson made the motion to terminate Haynes and Winters seconded it. Haynes' depo., p. 74; Winters' depo., pp. 15-16. Acting mayor Roberts broke the tie by voting in favor of Haynes' termination. Haynes' depo., p. 75; Roberts' depo., pp. 11-12.

They fired Haynes because of the newspaper article. Haynes' depo., pp. 72-73; 30(b)(6) depo., p. 9. Winters admits that he voted to fire Haynes because of the newspaper article and Haynes' refusal to give a retraction. Winters' depo., pp. 7-8, 15-16, 25. In the City of Durant's discovery responses, in response to Interrogatory No. 6, the City stated: "John Haynes was terminated because he made inappropriate comments to The Star-Herald newspaper on March 2, 2005, he became insubordinate and refused to answer questions from the board of aldermen regarding his comments to the Star-Herald newspaper." Defendants' Answers to Interrogatory No. 6, Exhibit "L." Winters had no explanation for all of the various reasons given in the April 4th letter from the City attorney. Winters' depo., p. 19-22.

Ferguson stated that he voted to fire Haynes because he "was not doing his job,

disobeying his superiors, writing articles in the paper talking about employees." Ferguson depo., p. 7.[1]

Roberts admitted that one of his reasons for firing Haynes was "the way he done Mr. Ferguson and Mr. Winters" in the paper. Roberts' depo., p. 8.

The Defendants state that Haynes' speech to the newspaper was part of his job. According to Alderman Winters, however, the problem was that the board did not give Haynes the authority to go to the newspaper. Winters' depo., p. 17. Haynes should have received permission to speak to the newspaper. Winters' depo., p. 22. Haynes did not have the authority to criticize the City in the newspaper. "Being a City employee, he should have never a statement like that in public to a newspaper ..." Deposition of Johnny Prichard, p. 7, Exhibit "M."

> Q.   You said it was improper for a City employee to speak to the newspaper about these things?
> A.   Yes.
> Q.   Why is that?
> A.   Well, according to the handbook, they are not supposed to do that.

Prichard depo., pp. 7-8.

Ferguson stated that "it's also in our handbook that he's not supposed to put stuff in the paper like that ..." Ferguson depo., p. 8. According to Dora Parkinson, who was elected an alderman in July 2005, Parkinson depo., pp. 3-4, "I did not think it was right. It was not loyalty, and I felt like he needed to go – he should have gone to his superior and – before he went that route." Parkinson depo., p. 7. Also, according to Parkinson:

---

[1]   Ferguson's complaints that Haynes was not doing his job and that he disobeyed the police chief were actually the same complaint, and both apparently related to Haynes' arrest of Ferguson in the Fred's parking lot. Ferguson depo., p. 7. Haynes had already, however, suffered a suspension and, in fact, had gotten the suspension revoked. Ferguson depo., p. 8.

> A.   It was very evident to me.  Number one, he didn't go through the right channels when he should have gone to his supervisor and the mayor before he went to the City – to the paper, and a lot of this was slander that could have been left out.  I don't know.
>
> Q.   Okay.
>
> A.   That's just it.

Parkinson depo., p. 12.

Haynes believed his termination was at least partially based on his race.  In executive

session, board members said

> ... we needed to get rid of him because he was getting too big for his breeches; and basically, yeah, because they made that – the final decision amongst themselves because, yeah, I was black and I made statements and I should have stayed in my place according to the way they were saying it.
>
> Yeah.  So I think, it was partly because of my race that I was fired.  I don't think that if I was a white man and said that, it would have been – people may been upset, but it wouldn't have been me being fired.

Haynes' depo., pp. 86-87.

In July 2005, there was an election in the City and Winters, Roberts and Mary Johnson

were all voted off the board.  30(b)(6) depo., p. 4; Haynes' depo., p. 84.  The new members were

Larry Boyd, who is African-American, Terry Floyd, who is also African-American, and Dora

Parkinson, who is Caucasian.  30(b)(6) depo., p. 5.  Johnny Prichard was elected mayor.  Prichard

depo., p. 2; 30(b)(6) depo., pp. 3, 12.

Haynes went to talk to Prichard about being hired back.  Prichard seemed receptive at

first.  Haynes' depo., pp. 102-03.

> So I called him back again, and he said he'll meet with me up here; so I came and talked to him.
>
> And he said, "well, my folks – we just – I mean, they just don't want you back."
>
> And I said, "what you mean?  Because I don't do a good job?"
>
> And he said, "no.  It's just – you know, it's too much done went on."

And I said, "what you mean?"  And he said, "you know, we just don't" – I said, "we, meaning white folks?  Your folks?"  And, again, his gesture was that, you know, well.

I said, "so you're telling me, because the white folks that you hang with don't want me back because of what I said, you ain't going – you won't try to hire me because that's best for the City, that we have people that trust and do the right thing."

And he just humped his shoulders and said, "well," just like that.

Haynes' depo., pp. 84, 103.

In the board meeting, Alderman Jim Ferguson said that Haynes needed to be kept in his place.  Haynes' depo., p. 94; see also, pp. 91-93.  Ferguson and Prichard badmouthed Haynes to new Alderperson Dora Parkinson.  They said "just that I wasn't good for the town and I shouldn't be hired back and that he wasn't going to never vote for me to come back."  Haynes' depo., pp. 97-98, 100, 113-14.

On July 19, 2005, John Haynes requested to be rehired as assistant police chief.  The board directed him to fill out a new application.  Board Minutes of July 19, 2005, Exhibit "N"; Haynes' depo., pp. 78-79; 30(b)(6) depo., p. 12.  In August of 2005, Haynes again sought to be rehired.  Black Aldermen Floyd, Bankhead and Boyd all voted to rehire Haynes.  White Aldermen Ferguson and Parkinson voted against rehiring him.  Mayor Prichard, also white, vetoed the motion.  Board Minutes of August 2, 2005, Exhibit "O."

On November 1, 2005, Haynes attempted to be rehired as a patrolman.  Black Aldermen Floyd, Bankhead and Boyd all voted for the rehire.  White Aldermen Parkinson and Ferguson voted against hiring Haynes.  Again, Mayor Prichard vetoed the motion.  Board Minutes of November 1, 2005, Exhibit "P"; 30(b)(6) depo., p. 16.  Prichard vetoed hiring Haynes because of the newspaper article.  Prichard said that he had had a couple of talks with Haynes and

Haynes had not had a "change of heart" about the article. 30(b)(6) depo., p. 17. Prichard did not like the article and thought Haynes should retract it. Prichard depo., pp. 3-5; see also Exhibit 15 to 30(b)(6) depo.

On April 18, 2006, Haynes again asked to be rehired as a patrolman. Only Boyd, Floyd, Parkinson and Alderman/vice-mayor Ferguson were present for the meeting. 30(b)(6) depo., p. 20; Board Minutes of April 18, 2006, Exhibit "Q." Aldermen Boyd and Floyd voted to rehire Haynes. Parkinson voted against rehiring Haynes because of the newspaper article. 30(b)(6) depo., p. 20; Parkinson depo., pp. 6-7, 9-13, 15. Alderman/vice-mayor Ferguson also voted against rehire, and the motion, therefore, died as not receiving a majority. Board Minutes of April 18, 2006.

At the May 17, 2006 board meeting, the board was faced with Attorney General Opinion 90-0728, which says that when the vice-mayor is acting as chairman of the meeting, he cannot vote. Therefore, the minutes from the April 18, 2006 board meeting were corrected, and Haynes was hired as a patrolman. Haynes' depo., pp. 24-25; 30(b)(6) depo., pp. 13, 19-20; Board Minutes of May 17, 2006, Exhibit "R."

## STANDARD OF REVIEW

"[S]ummary judgment is an extreme and drastic measure which courts should use sparingly and only in the clearest of cases." *Printy v. Crochet & Borel Services*, 196 F.R.D. 46 (E.D. Tex. 2000).

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Hirras v. National R.R. Passenger Corp.*, 95 F.3d 396, 399 (5th Cir. 1996) (quoting Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the burden of demonstrating that there is no evidence to support the non-movant's case. *Celotex Corporation v. Catrett*, 477 U.S. 317, 325 (1986).

In ruling on a motion for summary judgment, the Court is not to make credibility determinations, weigh evidence, draw inferences from the fact, or draw from the facts, legitimate inferences for the movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Rather, the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255.

Further, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). The United States Supreme Court noted:

> In doing so, however, the Court must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence... "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. Thus, although the Court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the Court should give credence to the evidence favoring the non-movant as well as that "evidence supporting the moving party that is uncontradicted and impeached, at least to the extent that the evidence comes from disinterested witnesses." *Id.* at 300.
> 530 U.S. at 150-51.

Also, questions of motivation and intent are fact questions to be determined by a jury.

*Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633 (5th Cir. 1985); *Kralaman v. Illinois Department of Veterans Affairs*, 23 F.3d 150 (7th Cir. 1994); *Batey v. Starr*, 24 F.3d 1330 (11th Cir.

1994).

Finally, a motion for summary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances. *Gibson v. Henderson*, 129 F.Supp.2d 890 (M.D. N.C. 2001).

## ARGUMENT I.

### THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING JOHN HAYNES' CLAIM FOR FIRST AMENDMENT RETALIATION AND DEFENDANTS' CLAIM OF QUALIFIED IMMUNITY.

In order to establish that his speech was entitled to First Amendment protection from retaliation, Haynes must establish that (1) the speech addressed a matter of public concern; (2) the interest in commenting on matters of public concern outweigh the Defendants' interest in promoting efficiency; and (3) the speech must have motivated the decision to terminate him. *Denton v. Morgan*, 136 F.3d 1038, 1043, n. 2 (5th Cir. 1998) (citing *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 465 (5th Cir. 1990)).

The Defendants do not contest any of these three elements, but rely solely on the holding of *Garcetti v. Ceballos*, ___, U.S. ___, 126 S.Ct. 1951 (2006).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, forum, and context of the given statement..." *Connick v. Myers*, 461 U.S. 138, 147 (1983).

Haynes' speech was made publicly and printed in the newspaper. Speech which relates to any evidence of corruption, impropriety or malfeasance of the part of city officials clearly

13

concerns matters of public concern. *Thompson*, 901 F.2d at 463; *Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 191-92 (5th Cir. 1988); *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988).

Haynes' interest in commenting on matters of public concern clearly outweighs the Defendants' interest in promoting efficiency. There is no promotion of efficiency in the hiding of malfeasance by a public official.

The public policy of Mississippi does not allow an employer to operate his workplace efficiently by firing employees who report illegal activity. This was established in *McArn v. Allied-Bruce Terminix Co., Inc.*, 626 So.2d 603 (Miss. 1993) (Mississippi public policy prohibits firing an employee because he reports illegal activity); see also, *Willard v. Paracelsus Health Care Corp.*, 681 So.2d 539, 542 (Miss. 1996); *Hammons v. Fleetwood Homes of Mississippi, Inc.*, 907 So.2d 357, 360 (Miss. App. 2004).

Finally, the Defendants conceded in deposition that Haynes' speech motivated their decision to terminate him, as well as to not rehire him.

Again, the Defendants do not dispute these elements but, rather, rely solely upon *Garcetti*, 126 S.Ct. 1951, for the holding "that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 126 S.Ct. at 1960.

In *Garcetti*, Ceballos was a deputy district attorney for Los Angeles County District Attorney's Office. One of Ceballos' duties was to advise his superiors on "how best to proceed with a pending case." *Id.* at 1955, 1960.

At the request of a defense attorney, Ceballos was asked to investigate alleged inaccuracies in an affidavit used to obtain a search warrant. *Id.* at 1955. Ceballos conducted the investigation and discovered "serious misrepresentations." *Id.* After his investigation, Ceballas verbally informed his superiors, as well as preparing a memorandum on his investigation, one of his duties, in which he recommended that the case be dismissed. *Id.* at 1955-56. Subsequently, Ceballos was reassigned to another job in another courthouse and also denied a promotion. *Id.* at 1956. Ceballas filed the lawsuit claiming, in part, retaliation due to the exercise of his First Amendment rights. *Id.*

The Supreme Court stated specifically, in finding that Ceballos' speech was not protected by the First Amendment, that his speech did not lack protection because it occurred "inside his office, rather than publicly," nor because "the memo concerned subject matter of Ceballos' employment." *Id.* at 1959. Rather, according to the Supreme Court, the controlling factor in Ceballos' case was that his statements were made "pursuant to his duties" as a calendar deputy. *Id.* at 1959-60.

*Garcetti* stated that First Amendment protections do not apply when the speech was made when carrying out routine and required job duties. In this case, the topics discussed by Haynes with the newspaper reporter had nothing to do with police matters. Haynes discussed how aldermen had gotten out of criminal charges, a matter of corruption of the courts. These were not matters of law enforcement by the police, but of corruption of a city court judge.

Haynes discussed the "buddy system" of politics in the City. He also discussed the fact that an alderman was sleeping with a City employee while on City time, a matter completely

unrelated to law enforcement. He said citizens should attend Board of Aldermen meetings. He discussed attracting business to the city. None of this was related to Haynes' duties as assistant police chief, much less being part of his required duties.

Speaking on these matters was not a routine and required job duty for Haynes. In fact, according to the aldermen and mayor, Haynes' comments were inappropriate. They testified specifically that he was fired because Haynes' comments to the newspapers were not a part of his job. They said he violated City policy by making those statements. According to the aldermen and mayor, his job did not include the duty of being critical of the City. Aldermen testified that Haynes violated the City's handbook by talking about these matters, and that he should have received permission from the chief of police before speaking to the newspaper. Haynes' speech was characterized as slander by Alderman Parkinson. Slander is clearly not a part of Haynes' duties.

As the holding of *Garcetti* does not apply in this case, the Defendants are not entitled to qualified immunity. In *Thompson v. City of Starkville, Miss.*, 901 F.2d 456 (5th Cir. 1990), the court specifically held that the qualified immunity defense did not protect defendants from similar retaliatory conduct. *Id.* at 463.

## ARGUMENT II.

### THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING JOHN HAYNES' CLAIM FOR EQUAL PROTECTION VIOLATIONS.

John Haynes makes out a claim equal protection in three ways. The first is that he was intentionally discriminated against because Haynes was black. A state actor violates the equal protection clause of the Fourteenth Amendment when it "intentionally discriminated against the

plaintiff because of membership in the protected class." *Whiting v. Tunica County*, 222 F.Supp.2d 809, 824 (N.D. Miss. 2002).

In this case, newly-elected Mayor Johnny Prichard and Aldermen Jim Ferguson and Dora Parkinson, all white, discriminated against Haynes because of his race by voting not to hire Haynes back. When Haynes sought to be reinstated to his position, Alderman Jim Ferguson specifically stated that Haynes needed to be kept in his place. There is a genuine issue of material fact as to whether this statement is racist. When Haynes talked to Mayor Prichard about being hired back, Prichard said, "well, my folks - we just - I mean, they just don't want you back." Haynes specifically asked Prichard if by "we" Prichard meant "white folks." Prichard just shrugged and said "well," in answer to that question. This can be taken as an admission that Prichard was vetoing Haynes' attempts to be rehired by the City because of the attitudes of Prichard's white constituents.

When Haynes sought to be reinstated in August 2005 and on November 1, 2006, all three black members of the board voted to rehire Haynes. Both white members of the board voted against rehiring Haynes. In July 2005 and August 2005, Mayor Prichard vetoed the majority of the board of aldermen because his white constituents did not want Haynes back on the job, because Haynes would not stay in his place. This is evidence that the mayor and the white aldermen "intentionally discriminated against the plaintiff because of membership in a protected class."

The second way in which Haynes makes out a claim for an equal protection violation is through the "class of one" analysis.

> Our cases have recognized successful equal protection claims brought by a "class of one," where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. See *Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, ... (1923); *Allegheny Pittsburgh Coal Co. v. Commission of Webster Cty.,* 488 U.S. 336, ... (1989). In so doing, we have explained that " '[t]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents.' " *Sioux City Bridge Co., supra,* at 445,...

*Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000).

The elements of a "class of one" equal protection claim were stated in *Whiting v. University of Southern Mississippi*, 451 F.3d 339, 348 (5th Cir. 2006):

> Under the standard set out in *Vill. of Willowbrook v. Olech,* 528 U.S. 562, ... (2000), for a "class of one" claim to withstand summary judgment, Dr. Whiting must have established genuine questions of material fact as to whether 1) "she was intentionally treated differently from others similarly situated" in the tenure process and 2) if different standards for tenure were applied, "that there [was] no rational basis for the difference in treatment." *Id.* at 564...

*Whiting*, 451 F.3d at 348 (footnote omitted).

In this case, John Haynes was treated differently than other employees of the City of Durant, Mississippi because he spoke out on the malfeasance of elected officials. Exercise of a protected First Amendment right of free speech cannot be held out as a "rational basis" for the difference in treatment. Attempting to protect the reputation of public officials guilty of misconduct is not a rational basis for the difference in treatment that Haynes received at the hands of the Defendants.

The Defendants are not entitled to qualified immunity on this point because they violated clearly-established law. "Class of one" analysis has been applied in the Fifth Circuit in the

18

employment context. *Whiting v. University of Southern Mississippi*, 451 F.3d 339, 348-49 (5th Cir. 2006); *Warner v. Smith*, 2007 WL 2558118, *1 (S.D. Miss. 2007); *Reyes v. Waslaco Independent School Dist.*, 2007 WL 2538804, *8 (S.D. Tex. 2007). In the course of determining a qualified immunity issue, the court can look to authorities outside of the Fifth Circuit and Supreme Court precedent to determine what is clearly-established law. *McClendon v. City of Columbia*, 305 F.3d 314, 327-29 (5th Cir. 2002). Other circuits have applied the "class of one" analysis in contexts outside of the land use issue raised in *Village of Willowbrook,* 528 U.S. 562. See, e.g., *Boyd v. Illinois State Police*, 384 F.3d 888, 389 (7th Cir. 2004) ( application of class of one analysis in employment context); *Sellars v. City of Gary*, 453 F.3d 848, 850-51 (7th Cir. 2006) (class of one analysis applied to denial of employee benefits); *Squaw Valley Development Co. v. Goldberg*, 375 F.3d 936, 944 (9th Cir. 2004) (class of one analysis in overzealous regulation enforcement); *Hayut v. State University of New York*, 352 F.3d 733, 754 (2nd Cir. 2003) (class of one analysis applied to teacher-on-student sexual harassment); *Campagna v. Massachusetts Dept. of Environmental Protection*, 334 F.3d 150, 156 (1st Cir. 2003) (class of one analysis applied to discriminatory regulatory enforcement of environmental regulations); *DeMuria v. Hawkes*, 328 F.3d 704, 706-07 (2nd Cir. 2003) (class of one analysis applied to discriminatory law enforcement); *Wojcik v. Massachusetts State Lottery Com'n*, 300 F.3d 92, 104-05 (1st Cir. 2002) (class of one analysis applied to wrongful termination and selective enforcement); *Costello v. Mitchell Public School Dist. 79*, 266 F.3d 916, 921 (8th Cir. 2001) (class of one analysis applied to education of retarded students); *Ford Motor Co. v. Texas Dept. of Transp.*, 264 F.3d 493, 510 (5th Cir. 2001) (*Olech*'s class of one analysis favorably cited in discussion of regulation of automobile sales); *Bartell v. Aurora Public Schools*, 263 F.3d 1143, 1149 (10th Cir.

2001) (class of one analysis applied to sexual harassment investigation of employees).

John Haynes was singled out by the Defendants for different treatment on an irrational and indefensible basis. Their actions were not "objectively reasonable." *Wilson v. Layne*, 526 U.S. 603, 619 (1999).

Haynes' equal protection claim is also supported under the "personal vindictiveness" analysis. The Fifth Circuit Court of Appeals has stated "that personal vindictiveness might be an improper motive in a selective enforcement case,..." *Beeler v. Rounsavall*, 328 F.3d 813, 817 (5th Cir. 2003). Other circuit courts have recognized that equal protection claims, even if not class-based, could succeed where there is proof that selective treatment was based on malicious and bad faith intent to harm the plaintiff. *Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen*, 878 F.2d 16 (1st Cir. 1989); *LeClair v. Saunders*, 627 F.2d 606, (2nd Cir. 1980); *Esmail v. McCrane*, 53 F.3d 176 (7th Cir. 1995). To demonstrate a personal vindictiveness equal protection claim, the plaintiff must prove that the cause of the different treatment is an illegitimate animus toward the plaintiff by the defendant. *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001).

In this case, the Defendants' reason for firing, and then not rehiring, Haynes was based on anger at Haynes' protected political speech and the desire to keep Haynes in his place. This is a totally illegitimate animus toward Haynes on the part of the individual Defendants, which they carried out as aldermen and mayor.

The Defendants are, therefore, not entitled to qualified immunity on John Haynes' claim of violation of his equal protection rights under the Fourteenth Amendment to the United States

Constitution.  Defendants Ferguson, Parkinson and Prichard prevented Haynes from being rehired on at least two occasions in 2005, and they should be held accountable for that.

In April 2006, Aldermen Parkinson and Ferguson prevented Haynes from being hired for a month until the attorney general's office gave its opinion that Ferguson's vote was illegal. Ferguson's violation of law further underlines the irrational basis of his actions.

### ARGUMENT III.

### THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING EACH ELEMENT OF JOHN HAYNES' CLAIM FOR RACE DISCRIMINATION UNDER TITLE VII, 42 U.S.C. § 1981 AND 42 U.S.C. § 1983.

As a preliminary matter, the Defendants seek dismissal of John Haynes' Title VII claims against the individual Defendants.  Individual liability does not exist under Title VII, and Haynes does not bring his Title VII claim against the individual Defendants.  See, e.g., *Pryor v. Wolfe*, 196 F.Appx. 260 (5th Cir. 2006).  The individual Defendants are, however, liable under 42 U.S.C. § 1981 for race discrimination.  *Faraca v. Clements*, 506 F.2d 956 (5th Cir. 1975); *Al-Khazraji v. Saint Francis College*, 784 F.2d 505 (3rd Cir. 1986); *Manuel v. International Harvester Co.*, 502 F.Supp. 45 (N.D. Ill. 1980); *Coley v. M & M Mars, Inc.*, 461 F.Supp. 1073 (M.D. Ga. 1978); *Okoro v. Jackson County Nursing Home*, 687 F.Supp. 1265 (S.D. Ill. 1988); *Hicks v. IBM*, 44 F.Supp.2d 593 (S.D. N.Y. 1999).

As a second preliminary matter, the Defendants claim that John Haynes' Title VII claim is untimely.  The EEOC mailed its Dismissal and Notice of Rights letter on November 14, 2006. Haynes filed his Second Amended Complaint on March 2, 2007 [Docket 26].  However, both Haynes' original Complaint [Docket 1] and First Amended Complaint [Docket 2] specifically

addressed the issue of Haynes' EEOC charge.

      Paragraph 2 of the First Amended Complaint states, in part:

> Additionally, the action arises under 42 U.S.C. § 1981, and under Title VII of the Civil Rights Act of 1964. However, Plaintiff has just filed the EEOC charge, attached hereto Exhibit "A," and has not yet received his right to sue letter. Plaintiff currently does not sue under Title VII of the Civil Rights Act of 1964, but requests this Complaint be considered amended to sue under Title VII at such time as the right to sue letter is received with respect to the EEOC charge, Exhibit "A."

First Amended Complaint, ¶ 3.

      Therefore, John Haynes' Complaint should be considered amended in a timely fashion. Regardless, however, of the timeliness of Haynes' Title VII claim, Haynes' race discrimination claims under 42 U.S.C. ¶ 1981 and 42 U.S.C. ¶ 1983 are not dependent upon an EEOC right to sue letter and are, therefore, unaffected.

      To make out a claim for race discrimination, John Haynes must demonstrate that there are genuine issues of material fact regarding the four elements of a prima facie case: (1) he is a member of a protected group or class; (2) he was qualified for his position; (3) he was subjected to an adverse employment action; and (4) he was replaced by someone outside the protected class or that he was otherwise not hired because of his race. *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir. 1999); *Fields v. J.C. Penney Co., Inc.*, 968 F.2d 533, 536, n. 2 (5th Cir. 1992); *Smith v. Equitrac Corp.*, 88 F.Supp.2d 727, 733 (S.D. Tex. 2000).

      The Defendants do not challenge the fact that John Haynes makes out a *prima facie* case of discrimination. They rest their entire defense against Haynes' race claims by attempting to narrow these claims down to the April 18, 2006 board meeting. On April 18, white Aldermen

Dora Parkinson and Jim Ferguson voted against rehiring John Haynes as a patrolman despite the fact that Alderman Jim Ferguson's vote was later thrown out because it was illegal, Haynes was prevented from being hired for one month until the May 17, 2006 board meeting.

The Defendants do not even address the three occasions in 2005 when Haynes attempted to be rehired by the City of Durant. In April 2005, Aldermen Ferguson and Parkinson voted against rehiring Haynes. Even though they were outvoted by the black aldermen, Mayor Prichard vetoed the hiring. As Mayor Prichard told Haynes, he was against hiring Haynes because of the attitudes of his white constituents. As Alderman Ferguson put it, Haynes did not know his place.

The same thing happened again on November 1, 2005. The board voted along racial lines with the three black members, Floyd, Bankhead and Boyd, all voting in favor of rehiring Haynes. White Aldermen Parkinson and Ferguson voted against hiring Haynes. For the second time, Mayor Prichard vetoed the hiring. The City of Durant is liable for the actions of its policymaking officials, and the individual Defendants are liable for their own actions under 42 U.S.C. §§ 1981 and 1983.

John Haynes' Second Amended Complaint specifically raises the issue of the City's failure to re-hire him in both 2005 and 2006.

## ARGUMENT IV.

### THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING JOHN HAYNES' CLAIM FOR MALICIOUS INTERFERENCE WITH EMPLOYMENT.

John Haynes raises the issue of malicious interference with employment, related both to

23

his termination and to the City's failure to re-hire him.

Mississippi appellate courts have repeatedly held that Mississippi recognizes a cause of action for malicious interference with employment. See *Levens v. Campbell*, 733 So.2d 753 (Miss. 1999); *Collins v. Collins*, 625 So.2d 786, 790 (Miss. 1993); *Shaw v. Burchfield*, 481 So.2d 247, 254-55 (Miss. 1985); *Morrison v. Mississippi Enterprise for Technology, Inc.*, 798 So.2d 567, 574-75 (Miss. App. 2001); *Hollywood Cemetery Ass'n. v. Board of Mayor and Selectmen of City of McComb*, 760 So.2d 715, 719 (Miss. 2000). The Mississippi Supreme Court has also held that this cause of action may be maintained even if the employee is at-will. See *Levins*, 733 So.2d at 760. Further,

> "[t]ortious interference with a contract" is defined as a malicious or intentional interference with a valid and enforceable contract by a third party which causes one contracting party not to be able to perform and the failure to perform results in a monetary loss for the other contracting party.

*Courtney v. Glenn*, 782 So.2d 162, 164-65 (Miss. App. 2000) (citing *Cenac v. Murry*, 609 So.2d 1257, 1268 (Miss. 1992).

While it is true that a person in the position of authority on behalf of another is privileged to interfere with the contract between the principal and another, "to maintain the privilege, he must be acting within the scope of that authority and without bad faith." *Courtney*, 782 So.2d at 165 (citing *Shaw v. Burchfield*, 481 So.2d 247, 255 (Miss. 1985). Further, privileged interference must be undertaken by someone in the exercise of a legitimate interest or right. *King's Daughters and Sons Circle Number Two of Greenville, Miss. v. Delta Regional Medical Center*, 856 So.2d 600, 604 (Miss. App. 2003). "Under Mississippi law, an agent for a disclosed principal can be held personally liable for his own tortious acts committed within the scope of his employment, and a tort claim can be maintained against that agent. *Hart v. Bayer Corp.*, 199 F.3d 239, 247 (5th Cir.

2000).  The agent is subject to personal liability when he 'directly participates in or authorizes the commission of a tort.'  *Hart*, 199 F.3d at 247 (quoting *Mississippi Printing Co., Inc. v. Maris, West & Baker, Inc.*, 492 So.2d 977, 978 (Miss. 1986)."  *Collums ex rel. v. Union Planters Bank*, 2000 WL 877003, *2 (N.D. Miss. 2000).

The elements of tortious interference with a contract include: (1) the acts were intentional and willful; (2) that they were calculated to cause damages to the plaintiffs in their lawful business; (3) that they were done with the unlawful purpose of causing damage and loss, without right or justifiable cause of the part of the defendant; and (4) that an actual loss occurred.  See *Levens,* 733 So.2d at 760-61.

The acts of all the individual Defendants were intentional and willful, and were calculated to cause damages to the Plaintiff in his law business, i.e., he was fired.  They were done for the purpose of causing damage and loss, and there was no right or justifiable cause on the part of the Defendants.  Haynes was fired and lost income; therefore, actual loss occurred.

For the interference to be privileged, it must have been exercised to further a legitimate interest or right.  It is impossible to argue that terminating someone because they exercised their First Amendment right of free speech is a legitimate interest or right.   Nor can race discrimination be considered a "right or justifiable cause on the part of the defendants."  Firing someone, and then refusing to re-hire, someone for these unlawful reasons cannot be considered good faith.  Therefore, there are genuine issues of material fact regarding John Haynes' claim for malicious interference with employment.

## CONCLUSION

Therefore, for the above-stated reasons, Plaintiff John Haynes prays that the Defendants'

Motion for Summary Judgment be denied in all respects.

Respectfully submitted,

WAIDE & ASSOCIATES, P.A.

BY: ***/s/ Luther C. Fisher, IV***
       LUTHER C. FISHER, IV
       MSB # 8687

WAIDE & ASSOCIATES, P.A.
ATTORNEYS AT LAW
POST OFFICE BOX 1357
TUPELO, MISSISSIPPI 38802
TELEPHONE:  662/842-7324
FACSIMILE: 662/842-8056
EMAIL: waide@waidelaw.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I, Luther C. Fisher, attorney for Plaintiff, do hereby certify that I have this day electronically filed the above and foregoing with the Clerk of the Court, utilizing the ECF system, which sent notification of such filing to the following:

Gary E. Friedman, Esq.
Latoya Merritt, Esq.
friedmag@phelps.com
merrittl@phelps.com
mccullyb@phelps.com

THIS the 26th day of September, 2007.

***/s/ Luther C. Fisher, IV***
       LUTHER C. FISHER, IV